CITIZENS COORDINATING COMMIT-
TEE ON FRIENDSHIP HEIGHTS,
INC., et al., Plaintiffs,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Defendant,

v.

THERMO CONTRACTING CORPORA-
TION, Third Party Defendant.

Civ. A. No. 82–0730.

United States District Court,
District of Columbia.

May 24, 1983.

Jeffrey G. Miller, Angus Macbeth, Mat-
thew Weston-Dawkes, Washington, D.C.,
for Citizens Coordinating Committee, the
Town of Somerset, Mr. & Mrs. Matthew
Fink, and Mr. & Mrs. Amos T. Wilder.

Waldemar J. Pflepsen, Jr., for Prudential
Ins. Co. and Finsbury Properties, Inc.

Frank R. Filiatreau, Jr., Washington,
D.C., for defendant.

Laurence T. Scott, Washington, D.C., for
third-party defendant.

MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This action is before the Court on the
motion of Citizens Coordinating Committee

on Friendship Heights, Inc., the Town of Somerset, Maryland, and the individual plaintiffs for an award of costs and attorneys' fees. For the reasons set forth below, the Court grants the motion and awards attorneys' fees and costs in the amount of $60,936.79.

## I. *Background to this Lawsuit*

This action was filed under the citizen suits provision of the Clean Water Act (the Act), § 505, 33 U.S.C. § 1365 (1976), challenging the unauthorized discharge of oil and solids into the Little Falls Branch stream by the Washington Metropolitan Area Transit Authority (WMATA). Plaintiffs contend that WMATA's failure to obtain discharge permits violated sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides:

Except as in compliance with this section and section [ ] ... 1342 ... of this title, the discharge of any pollutant by any persons shall be unlawful.

Section 1342 establishes a national pollutant discharge elimination system (NPDES) to allow discharge of pollutants, notwithstanding Section 1311(a), to holders of NPDES permits. Section 505 of the Act, 33 U.S.C. § 1365, permits citizens, after giving 60 days notice, to commence a civil action against any person, including a governmental instrumentality or agency, "who is alleged to be in violation of (A) an effluent standard or limitation under this chapter ...."

In January 1982, plaintiffs presented notice of the claimed violations and intent to sue to WMATA, WMATA's contractors, the owners of the Mazza Gallerie shopping center at 5300 Wisconsin Avenue, and the appropriate government agencies, alleging that WMATA's discharge of pollutants without an NPDES permit violated the Act. In addition, plaintiffs, ultimately joined by the owners of the Mazza Gallerie, alleged common law nuisance and negligence causes of action against WMATA for the discharges and odors which deprived plaintiffs of use and enjoyment of the stream and its environs, including parkland, yards, homes and the Mazza Gallerie shopping center.

The unauthorized discharges came from a WMATA bus yard and the construction site of a subway tunnel along Wisconsin Avenue. Construction of the subway tunnel created cement and rock dust which was discharged, along with diesel fuel, into Little Falls Branch near the intersection of Drummond Avenue and Wisconsin Avenue. The diesel fuel seeped into the subway tunnel from an underground plume of oil formed by leaking underground storage tanks at WMATA's Wisconsin Avenue bus yard. Diesel fuel from this plume also seeped into a sump in the basement of the Mazza Gallerie, from which it was pumped into Jennifer Run Storm Sewer. The oil ultimately entered Little Falls Branch downstream from the tunnel discharge. Oil contained in the runoff from the bus yard and from inadequately run oil/water separators at the bus yard was also discharged into the storm sewer.

Prior to receipt of the notification, WMATA was aware of the discharge problems and had undertaken a few remedial steps to abate the pollution. It had begun construction of an oil/gravity separator at the tunnel outfall designed to achieve an effluent of 30 mg./1, dug exploratory wells at the bus yard for recovering oil, and recognized responsibility to the Mazza Gallerie for underground oil seepage into its basement. WMATA provided many more commitments to clean up Little Falls Branch in the course of this litigation. *See generally,* Consent Decree between Plaintiffs and Defendant (filed Oct. 4, 1982); Declaration of Jeffrey G. Miller, ¶¶ 22, 40 (filed Feb. 4, 1983). In contrast to WMATA's original position, a principal objective of the Consent Decree was to eliminate the odor caused by the discharge. *Id.* at Article VII.

## II. *Negotiations and Injunctive Relief*

On March 15, 1982, plaintiffs filed this action. The parties began negotiations to reach a consent decree, but reached an impasse in June 1982 over technical solutions, control of odor, and award of damages and penalties. Several settlement conferences

were held in chambers during the summer of 1982.

In June 1982, plaintiffs sought a preliminary injunction to halt the proposed resumption of a washdown of the subway tunnel track drain which had resulted previously in milky white, sediment-laden discharges into Little Falls Branch. The Court granted a temporary restraining order on June 16 to halt the planned washdown. On June 24, the Court granted a preliminary injunction which permitted the washdown so long as the discharge was diverted into a Washington Suburban Sanitary Commission sewer line.

### III. The Consent Decree

WMATA and plaintiffs arrived at a settlement, approved and entered by this Court on October 4, 1982 as a consent decree, which required WMATA to address the pollution problem at the bus yard and subway tunnel sources and begin to restore the stream to its pre-discharge condition. WMATA also agreed to pay $10,000 damages to the Little Falls Branch Improvement Fund, and plaintiffs' costs of litigation, including reasonable attorney and expert witness fees.

Several public benefits have resulted from this lawsuit. Among them are WMATA's activities in mapping and managing the underground oil plume so that it will not directly or indirectly contaminate the Little Falls Branch; hiring of an experienced environmental consulting firm to develop and supervise proper remedial plans; developing a spill prevention, control and countermeasures plan for the bus yard; and developing a system to detect leaks in the underground storage tanks at an early time. The difficulty in negotiating the decree was due in part to the complex technical engineering problems involved in this case. See Declaration of Timothy G. Shea (filed March 11, 1983). Plaintiffs have monitored WMATA's compliance by reviewing the numerous reports required by the consent decree.

### IV. Plaintiffs' Entitlement to a Fee Award

In issuing a final order in any citizens suit under the Clean Water Act, the court may award costs of litigation, including reasonable attorney and expert witness fees, "whenever the court determines such award is appropriate." § 505(d) of the Act, 33 U.S.C. § 1365(d). WMATA does not dispute that reasonable fees are appropriate in this case. See Article VIII of the Consent Decree; Defendant's Brief in Opposition, at 4 (Defendant's Opposition). However, WMATA contends that the number of hours claimed and the hourly rates requested are unreasonable.

On October 29, 1982, plaintiffs submitted their statement to WMATA in accordance with Article VIII of the Consent Decree for $88,344.13. That figure included $10,777.50 for attorney fees and $185.76 in expenses to the Mazza Gallerie, items not involved in this motion. See Declaration of Jeffrey G. Miller, Exhibit Q (filed Feb. 4, 1983). WMATA offered to pay $6,623 of this amount. Id., Exhibit R. Plaintiffs then filed the instant motion for an award of fees and costs in the amount of $71,926.40.

### V. Calculation of the Award

Analysis of an award of attorneys' fees begins with determining the "lodestar" amount. "Any fee-setting inquiry begins with the "lodestar": the number of hours multiplied by a reasonable hourly rate. The figure generated by that computation is the basic fee from which a trial court judge should work." Copeland v. Marshall, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc). See also National Association of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319 (D.C.Cir.1982); Environmental Defense Fund, Inc. v. Environmental Protection Agency, 672 F.2d 42 (D.C.Cir.1982).

### A. Hours Expended

The number of hours reasonably expended involves consideration of the kinds of work performed and whether any actual hours expended were duplicative or nonproductive. Copeland v. Marshall, supra at 891.

The actual hours expended by the plaintiffs' three attorneys follow:

Actual Hours Expended

| Jeffrey G. Miller | 347.6 hours |
|---|---|
| Angus Macbeth | 32.2 hours |
| Matthew Weston-Dawkes | 360.5 hours |

Plaintiffs excluded from their fee request 71.5 hours of Mr. Miller's time, 3.0 hours from Mr. Macbeth's time and 37.4 hours from Mr. Weston-Dawkes' time as time relating to matters not at issue under the Clean Water Act, such as research on common law remedies and response to press inquiries. They also excluded hours which were not sufficiently documented. In addition, 10 percent of Mr. Weston-Dawkes' time was excluded because of his relative inexperience in environmental law. The hours for which compensation is requested follow:

Hours Claimed for Compensation

| Jeffrey G. Miller | 276.1 hours |
|---|---|
| Angus Macbeth | 29.2 hours |
| Matthew Weston-Dawkes | 290.8 hours |

Each of the attorneys submitted a detailed affidavit describing the work performed during the claimed hours. The attorneys kept detailed contemporaneous records of the time they actually spent on the case. The time was divided into categories of work for six stages of the case: stage I, development of the case; stage II, filing of the case; stage III, settlement negotiations; stage IV, temporary restraining order and preliminary injunction; stage V, settlement, and stage VI, compliance with decree. Each stage of the case was broken down into types of activities; for instance, "client conferences," "WMATA telecons," "site visits," etc. The hours spent during each stage of the case performing each type of activity were provided in chart form by each attorney. The following chart indicates the hours Messrs. Miller, Macbeth and Weston-Dawkes claim during each stage of the case:

| | Fee Petition | I | II | III | IV | V | VI | Total |
|---|---|---|---|---|---|---|---|---|
| Miller | 50 | 32.3 | 42.6 | 62.4 | 41.3 | 16.5 | 31.0 | 276.1 |
| Macbeth | | 5.6 | 4.0 | 1.8 | 17.8 | | | 29.2 |
| Weston-Dawkes | 32.3 | 26.2 | 83.9 | 113.9 | 36.8 | 15.5 | 14.5 | 290.8 * |

(* reflects 10% reduction of stated hours due to inexperience).

WMATA requested an auditor to review the fee request to verify hours, rates, and expenses. His findings indicate that the documentation of hours expended is accurate.

The Court finds the hours claimed accurately reflect the time plaintiffs' three attorneys spent on this case. The roles of counsel were clearly differentiated. Mr. Miller acted as lead counsel with primary responsibility for contact with clients and WMATA, and for strategy, negotiation and court appearances. Mr. Weston-Dawkes was primarily responsible for contact with government agencies, Mazza Gallerie, co-counsel and expert witnesses, and for document review, factual analysis and initial drafts of documents. Mr. MacBeth acted as occasional advisor and consultant. He also helped draft pleadings and papers for the temporary restraining order.

Defendant labelled the first five drafts of the consent decree wasted effort and nonproductive use of time because plaintiffs did not confer with their technical consultant on these drafts and only the fifth draft was submitted to WMATA for consideration. It argued further that plaintiffs were ill-equipped to develop an appropriate technical solution for abating the pollution problem and wasted time by making inappropriate or impossible recommendations. WMATA also contested the involvement of three attorneys in this case in view of the small number of court appearances and settlement by consent decree. Finally, it claimed a lack of adequate explanation or justification for the number of hours expended by plaintiffs' counsel.

The Court does not find the number of drafts of the consent decree to be excessive or represent nonproductive use of time.

Complex factual matters and difficult legal issues abounded: determining the exact sources of oil discharged into Little Falls Branch and its conduits; ascertaining the responsible party and government agencies responsible for issuing permits; and the framing of possible remedies. Plaintiffs' suggestions regarding the abatement of pollution were substantially incorporated into WMATA's efforts. Their recommendations reflected an intelligent approach to the complexities involved in dealing with an unknown amount of underground oil entering Little Falls Branch by various routes. When WMATA objected to the scope of plaintiffs' initial drafts, plaintiffs invited WMATA to propose its own technical plan to recover the oil.

WMATA uncovered one inconsistency between Mr. Miller's and Mr. Weston-Dawkes' affidavits. During stage IV of the case denominated "TRO and PI" (temporary restraining order and preliminary injunction), Mr. Miller claimed 41.3 hours and Mr. Weston-Dawkes claimed 36.8 hours. In his affidavit Mr. Miller stated: "The pleadings and papers for the Temporary Restraining Order and Preliminary Injunction were done by myself and Mr. Macbeth, as Mr. Weston-Dawkes was fully engaged on another case at that time." Miller Declaration, ¶ 36 at 34. Mr. Macbeth corroborated this statement. Macbeth Declaration, ¶ 6 at 3. However, Mr. Weston-Dawkes indicated he prepared for and attended the TRO hearing, and prepared the initial draft of the preliminary injunction hearing, and performed other activities concerning the case during stage IV. Weston-Dawkes Declaration, ¶ 11 at 7. When Mr. Weston-Dawkes' time was reviewed by WMATA's auditor, no discrepancies were revealed. It is unlikely that Mr. Weston-Dawkes failed to perform the tasks he indicated he did perform. He indicated that although he was heavily committed to another case at the time, he prepared the initial expert witness' declaration for the TRO. Weston-Dawkes Declaration, ¶ 10 at 6. WMATA did not assert these hours were claimed falsely. The inconsistency is more reasonably explained by Mr. Weston-Dawkes' preoccupation with another case only during the time that Mr. Miller and Mr. Macbeth drafted the pleadings and papers but not for all of stage IV.

Plaintiffs recognized they spent more time on this case than would be expected normally. They attributed the extra time primarily to two factors. The first was the unfamiliarity of WMATA's counsel with environmental law. Mr. Filiatreau, the WMATA attorney assigned to this case, stated that prior to this case he had no experience in environmental law. Declaration of Frank R. Filiatreau, Jr., at 1–2 (filed March 11, 1983). The second factor alleged to have caused a protracted negotiation process was WMATA's reluctance to accept plaintiffs as legitimate enforcers of the Act. WMATA attempted repeatedly to avoid dealing with plaintiffs by insisting it would abide by the permitting authority's requirements when a permit was obtained and that was all it would do. Plaintiffs observed that WMATA agreed to many of their demands despite an initial reluctance.

The Court finds that the number of hours spent by plaintiffs' attorneys on this case were reasonable. Plaintiffs developed a negotiating posture which led to many of the changes they sought. Their counsel resolved the issues and advanced their clients' interests as expeditiously as possible. WMATA was reluctant to address the issues raised by plaintiffs; most of the delay in reaching a settlement was attributable to WMATA.

The Court finds duplicative the nine hours expended by Mr. Miller and Mr. Macbeth in consultation with each other. While that consultation may have been necessary, the Court considers double-billing for that time to be inappropriate. The Court will deduct the nine hours from Mr. Macbeth's time in view of his lesser involvement with this case.

In reviewing the entire record, the Court finds as the number of hours reasonably expended:

| | |
|---|---|
| Jeffrey G. Miller | 276.1 |
| Angus Macbeth | 20.2 |
| Matthew Weston-Dawkes | 290.8 |

### B. *Hourly Rate*

The reasonable hourly rate is determined by reference to rates "prevailing in the community for similar work." *Copeland v. Marshall, supra,* at 892. The prevailing community rate is established by evidence of the hourly rates of attorneys doing comparable work and recent fees awarded by courts in comparable cases. *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1324-26 (D.C.Cir. 1982).

The hourly rates requested in this action are: $125/hour for Mr. Miller; $125/hour for Mr. Macbeth; $90/hour for work performed by Mr. Weston-Dawkes after March 1, 1982 and $75/hour for work performed by him before March 1, 1982. These rates reflect the billing rates set by the law firm's management committee used in actual billing for an environmental matter regardless of outcome. The rates requested for Mr. Miller and Mr. Macbeth are supported by plaintiffs' survey of attorneys with similar experience working on comparable matters. That survey reflected billing rates between $120/hour and $150/hour.

This District Court approved fees in 1981 of $110/hour for environmental legal representation for attorneys with over nine years experience; $125/hour for attorneys with over 20 years experience, and $80/hour for attorneys with four to eight years experience. *North Slope Borough v. Andrus,* 515 F.Supp. 961, 966-70 (D.D.C.1981), *rev'd on other grounds sub nom. Village of Kaktovic v. Watt,* 689 F.2d 222 (D.C.Cir.1982). In *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 672 F.2d 42, 58 (D.C.Cir.1982), the United States Court of Appeals for the District of Columbia Circuit awarded three attorneys hourly rates of $110, $90 and $55.

Mr. Miller and Mr. Macbeth each present impressive credentials in environmental law. Mr. Miller held progressively more responsible positions as an enforcement attorney with the Environmental Protection Agency (EPA) from 1971 until 1981. From 1975-79, he served as Deputy Assistant Administrator for Water Enforcement. At EPA, Mr. Miller handled hundreds of enforcement cases under the Clean Water Act. Since 1981, he has practiced environmental law as a partner in a Washington, D.C. law firm. He has published articles and taught courses on environmental law.

■ Mr. Macbeth is also experienced in environmental law. He helped form the Natural Resources Defense Council and was a staff attorney there from 1970 until 1975. From 1975 until 1981, Mr. Macbeth served in the Land and Natural Resources Division of the Department of Justice as Chief of the Pollution Control Section and later as Deputy Assistant Attorney General. Since 1981, he has practiced environmental law as a partner in a Washington, D.C. law firm. Mr. Macbeth has taught numerous courses on environmental law for practicing attorneys and has published articles on that subject. Because Mr. Miller and Mr. Macbeth both have over nine years experience, a fee of $110/hour is reasonable and consistent with the rates in *North Slope Borough, supra,* and *Environmental Defense Fund, supra.*

Mr. Weston-Dawkes has practiced for six years as a litigation attorney. Although not an experienced environmental attorney, Mr. Weston-Dawkes has attended firm seminars on environmental law. Because of his inexperience in the area, 10 percent of his hours were discounted in the fee request. He drafted most of the initial pleadings and papers and incorporated revisions to successive drafts of the consent decree. He also dealt with plaintiffs' expert witness, Mazza Gallerie co-counsel and governmental agencies. The Court finds that $75/hour for work performed by Mr. Weston-Dawkes before March 1, 1982 is a reasonable rate. For work performed after March 1, 1982, the Court finds $85/hour is a reasonable rate considering Mr. Weston-Dawkes' increase in billing rate to $90/hour on that date.

The rates of $110/hour for Mr. Miller and Mr. Macbeth and $75/hour and $85/hour for Mr. Weston-Dawkes reflect reasonable compensation for the skill involved in negotiating the consent decree; the difficulty in framing a legal theory and fashioning an appropriate remedy under the Clean Water Act; and the importance and necessity of monitoring WMATA's activities for compliance. These rates are in keeping with the fair market value prevailing in the community for others similarly situated. WMATA's contention that a *pro bono* community rate applies was expressly rejected in *Copeland v. Marshall, supra* at 900.

The "lodestar" fee in this case follows:

|  | Hours | Rate/hour | Total |
|---|---|---|---|
| Mr. Miller | 276.1 | $110 | $30,371.00 |
| Mr. Macbeth | 20.2 | $110 | 2,222.00 |
| Mr. Weston-Dawkes | 73.8* | $ 75 | 5,535.00 |
|  | 217.0** | $ 85 | 18,445.00 |

\* Hours before March 1, 1982
\*\* Hours after March 1, 1982.  Lodestar = $56,573.00

Adjustments may be made to the "lodestar" figure to reflect other factors. These factors include the contingent nature of the fee, delay in receipt of payment for services rendered, the quality of representation, and exceptional results obtained. *Copeland v. Marshall, supra* at 892–94. In addition, fees may be reduced or denied based on the degree of success obtained, at least under statutes with a standard of "prevailing party." *See Hensley v. Eckerhart,* — U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (attorney's fees under 42 U.S.C. § 1988). Plaintiffs' counsel requested a 10 percent upward adjustment for delay in payment of attorneys fees and costs. An upward adjustment is warranted by WMATA's failure to agree to a reasonable award of attorneys' fees as required under Article VIII of the Consent Decree. Moreover, "the lodestar represent(s) the prevailing rate for clients who typically pay their bills promptly." *National Association of Concerned Veterans v. Secretary of Defense, supra* at 1328. Plaintiffs' attorneys first became involved with this case in September 1981. An adjustment for delay in receipt of payment is appropriate under these circumstances. *See Alabama Power Company v. Gorsuch,* 672 F.2d 1, 6 n. 29 (D.C.Cir.1982); *Environmental Defense Fund, Inc. v. Environmental Protection Agency, supra* at 60; *Copeland v. Marshall, supra* at 893. The Court will adjust the lodestar upward 5 percent.

The Court awards plaintiffs their reasonable attorney fees in the amount of $59,401.65 ($56,573 lodestar plus $2,828.65 upward adjustment of 5 percent). The expenses incurred by plaintiffs' attorneys in the amount of $1,535.14 are also awarded pursuant to the citizens suit provision of the Clean Water Act, 33 U.S.C. § 1365(d).

The citizens suit provision of the Clean Water Act was intended by Congress to encourage citizens to act as private attorneys general in enforcing the law and reducing water pollution. This award to plaintiffs of the costs of their successful litigation conforms to Congress's objective.

An appropriate order is attached.

## ORDER

Upon consideration of the motion of Citizens Coordinating Committee on Friendship Heights, Inc., the Town of Somerset, Maryland, and the individual plaintiffs for costs, including attorneys' and expert witness fees and expenses, defendant's opposition, plaintiffs' reply, defendant's supplemental reply and the entire record in this action, for the reasons stated in the accompanying memorandum opinion, it is by the Court this 24th day of May 1983,

ORDERED that the motion for costs, including attorneys' and expert witness fees and expenses is granted; it is further

ORDERED that plaintiffs are awarded the sum of $59,401.65 as reasonable attorneys' fees and $1,535.14 as costs incurred in this action; and it is further

ORDERED that defendant shall pay the sum of $60,936.79 to plaintiffs by check payable to their attorneys Bergson, Borkland, Margolis and Adler, within 30 days after entry of this Order.