## ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,

### v.

## ENVIRONMENTAL PROTECTION AGENCY, Respondent,

**Ad Hoc Committee on Liquid Dielectrics of the Electronic Industries Association, et al., Joy Manufacturing Co., Edison Electric Institute, et al., Aluminum Company of America, et al., Intervenors.**

### No. 79–1580.

United States Court of Appeals, District of Columbia Circuit.

Feb. 5, 1982.

---

See, also, D.C.Cir., 636 F.2d 1267.

Jacqueline M. Warren, David J. Lennett, Washington, D. C., Bingham Kennedy, McLean, Va., and Barry J. Trilling, Wash-

ington, D. C., were on the brief for petitioner.

Ellen Siegler, Atty., U. S. Environmental Protection Agency, and Donald W. Stever, Atty., U. S. Dept. of Justice, Washington, D. C., were on the brief for respondent.

Steven S. Rosenthal, Washington, D. C., was on the brief for intervenors, AC Paper & Film Capacitor Section of the Electronic Industries Ass'n and National Electrical Mfgrs. Ass'n.

Before ROBINSON, Chief Judge, EDWARDS, Circuit Judge, and HOWARD F. CORCORAN,* United States Senior District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | THE CHRONOLOGY OF EVENTS PERTAINING TO EDF'S MOTION FOR ATTORNEYS' FEES | 46 |
| II. | THE APPLICABLE STATUTORY STANDARD FOR AN AWARD OF ATTORNEYS' FEES UNDER TSCA | 47 |
| III. | THE EDF CLAIMS FOR ATTORNEYS' FEES | 50 |
| | A. Time Claimed For Work On The Case-In-Chief | 50 |
| | B. The Decision in Copeland v. Marshall | 51 |
| | C. EPA's Opposition To The Claim For Attorneys' Fees | 52 |
| IV. | AN EVALUATION AND JUDGMENT CONCERNING THE "HOURS REASONABLY EXPENDED," THE "REASONABLE HOURLY RATE," AND "ADJUSTMENTS TO THE 'LODESTAR'" | 53 |
| | A. Documentation | 54 |
| | B. Hours Reasonably Expended | 55 |
| | 1. EPA's Request To Reduce Hours In Connection With Work Performed On Issues Upon Which EDF Did Not Prevail | 55 |
| | 2. EPA's Request To Reduce Hours In Connection With Work Performed On Issues Raised By Industry Intervenors | 55 |
| | 3. EPA's Request To Reduce Hours In Connection With Work Performed During Post-Decision Negotiations | 56 |
| | C. The Reasonable Hourly Rates | 58 |
| | D. Calculation Of The "Lodestar" Fee | 59 |
| | E. Adjustments To The "Lodestar" | 59 |
| V. | THE AWARD OF ATTORNEYS' FEES ON THE CASE—IN—CHIEF | 61 |
| VI. | TIMELINESS OF EDF'S REQUEST FOR ATTORNEYS' FEES | 61 |

* For the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(d).

VII. THE ATTORNEYS' FEE CLAIM PERTAINING TO THE SUPPLEMENTAL FEE APPLICATION OF EDF FOR THE SERVICES OF TRILLING & KENNEDY _____ 61

 A. *EDF Entitlement To An Award Of Attorney' Fees For Time Spent In Preparing The Application For Fees* _____ 62

 B. *Documentation* _____ 63

 C. *Hours Reasonably Expended* _____ 63

 D. *Reasonable Hourly Rates* _____ 63

 E. *Adjustments To The "Lodestar"* _____ 63

VIII. THE AWARD OF ATTORNEYS' FEES FOR THE WORK DONE BY TRILLING & KENNEDY _____ 64

 IX. CONCLUSION _____ 64

HARRY T. EDWARDS, Circuit Judge:

On June 7, 1979, the Environmental Defense Fund (EDF) petitioned for review of regulations, issued by the Environmental Protection Agency (EPA), implementing Section 6(e) of the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601–2629 (1976). Section 6(e) of TSCA provides broad rules governing the disposal, marking, manufacture, processing, distribution, and use of a class of chemicals called polychlorinated biphenyls (PCBs). EDF sought review of three aspects of the EPA regulations. First, it challenged the determination by EPA that certain commercial uses of PCBs are "totally enclosed," a designation that exempts those uses from regulation under the Act. Second, it claimed that the EPA acted contrary to law when it limited the applicability of the regulations to materials containing concentrations of PCBs greater than 50 parts per million (ppm). Third, EDF challenged the decision by EPA to authorize the continued use of 11 non-totally enclosed uses of PCBs.

The oral argument in this case was held on June 6, 1980, and an opinion for the court was issued on October 30, 1980, in which it was held that:

(1) no substantial evidence supported the administrative determination by EPA to classify certain polychlorinated biphenyl uses as "totally enclosed" and therefore exempt;

(2) no substantial evidence supported the administrative decision by EPA to exclude from regulation all materials containing concentrations of PCBs below 50 ppm; but

(3) substantial evidence supported the administrative determination by EPA to allow the continued use of 11 non-totally enclosed uses.

*Environmental Defense Fund v. EPA*, 636 F.2d 1267 (D.C.Cir.1980). As a result of this decision by the court, the parties agreed upon and the court approved a series of new rulemaking proceedings designed to develop the factual bases for an improved approach toward the regulation of PCBs.

On August 24, 1981, EDF moved for an award of $156,600.00 in attorneys' fees for its participation in the case. This figure was later amended to $156,248.00. In addition, EDF requested $13,992.00 for the hours devoted by the law firm of Trilling & Kennedy for the preparation of a reply memorandum on the issue of attorneys' fees.

## I. THE CHRONOLOGY OF EVENTS PERTAINING TO EDF'S MOTION FOR ATTORNEYS' FEES

The following list details the sequence of events pertaining to EDF's motion for attorneys' fees:

Aug. 24, 1981—Motion of Petitioner EDF for attorneys' fees (hereinafter "*EDF Motion*")

Sept. 15, 1981—Opposition of AC Paper & Film Capacitor Section of the Electronic Industries Association to the EDF's Motions for Attorneys' Fees (hereinafter "*AC Paper Opposition*")

Sept. 15, 1981—Response of EPA to EDF's Motion (hereinafter "*EPA Response*")

Sept. 15, 1981—Statement of National Electrical Mfgrs.

Oct. 23, 1981—Motion by EDF for leave to supplement motion for attorneys' fees

Oct. 23, 1981—Supplementary declarations in support of EDF's motion for attorneys' fees (hereinafter "*EDF Supplementary Motion*")

Oct. 23, 1981—Motion of EDF for leave to file its motion for attorneys' fees out of time

Oct. 26, 1981—"Corrected" reply memorandum of EDF to EPA's and Intervenor EIA's responses in opposition to motion for attorneys' fees (hereinafter "*EDF Reply*")

Oct. 29, 1981—Respondent's motion for enlargement of time in which to respond to petitioner's motion for leave to supplement motion for attorneys' fees

Nov. 9, 1981—Order granting enlargement of time requested by EPA

Nov. 10, 1981—EPA's response in opposition to EDF's motion for leave to supplement motion for attorneys' fees (hereinafter "*EPA Response to Supplementary Motion*")

Nov. 20, 1981—Reply of EDF to EPA's Opposition to petitioner's motion for leave to supplement motion for attorneys' fees (hereinafter "*EDF Reply on Supplementary Motion*")

The opposition filed by intervenor AC Paper raises three issues. First, it is contended that the 837 hours of experienced lawyer time claimed by EDF appears to be an excessive expenditure of time for this case. Second, it is argued that there is no basis for EDF's request that its "lodestar" fee be adjusted upward by 100%. Finally, it is urged that *Petitioner's Motion* should

be dismissed because EDF's request for fees is over nine months out of time. The EPA, although opposing EDF's motion for fees on several grounds, has not contended that the motion is untimely. EDF, not surprisingly, rejects the claim that its Motion is untimely; however, in an abundance of caution, EDF has filed a "Motion For Leave To File Its Motion for Attorneys' Fees Out of Time." [1]

The *EPA Response* to the *EDF Motion* does not seriously contest the claim for attorneys' fees.[2] Rather, EPA makes the following principal arguments:

(1) The court should strictly scrutinize EDF's claims for attorneys' fees. *EPA Response* at 6–9.

(2) EDF's estimated "lodestar" fee is substantially exaggerated, both in terms of the "number of hours reasonably expended" and the "reasonableness of the hourly rate." *Id.* at 12–21.

(3) No upward adjustment to the "lodestar" is warranted. *Id.* at 21–26.

These arguments duplicate those raised by AC Paper except with respect to the timeliness issue.

## II. THE APPLICABLE STATUTORY STANDARD FOR AN AWARD OF ATTORNEYS' FEES UNDER TSCA

■ Section 19(d), of TSCA, 15 U.S.C. § 2618(d), authorizes awards of attorneys' fees in cases involving petitions for review of regulations brought, as was the instant case, pursuant to section 19(a):

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such decision, may include an award of costs of suit and reasonable attorneys' fees for attorneys and expert witnesses if the court determines such an award is appropriate.

---

1. In this Motion, EDF avers that "Counsel for EPA has authorized the undersigned to represent that EPA does not object to the granting of this Motion for Leave to File Out of Time." *Id.* at 2.

2. Although EPA does argue that "EDF's claim should be rejected for lack of adequate documentation," *EPA Response* at 10, there is no real claim that EDF is not entitled to some amount of attorneys' fees.

**48**

As was noted in *Sierra Club v. Gorsuch*, 672 F.2d 33 (D.C.Cir.1982), a case involving a comparable attorneys' fee provision under the Clean Air Act:

> On its face, the statutory provision clearly permits the court to award attorneys' fees to prevailing, substantially prevailing, or non-prevailing parties in "appropriate" cases.

*Id.* at 34. The same may be said of the relevant statutory provision in section 19(d) of TSCA.

The significance of the attorneys' fee provision of TSCA may be highlighted by comparison to other statutory fee provisions. For example, 5 U.S.C. § 552(a)(4)(E) provides that attorneys' fees under the Freedom of Information Act are available only to a complainant who has "substantially prevailed." Likewise, 28 U.S.C. § 2412(b), covering awards of fees against the United States, provides that:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . *to the prevailing party* in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity. . . .

(emphasis added).[3] In enacting a provision allowing for an award of attorneys' fees whenever a court finds that such "an award is appropriate," it seems plain that Congress intended to give the courts greater latitude than is allowed under statutes such as FOIA ("substantially prevailing") and 28 U.S.C. § 2412 ("prevailing party").

Albeit sparse, the legislative history surrounding the attorneys' fee provision of TSCA confirms this reading and offers some guidance in identifying "appropriate" cases. Section 19 in the original Senate and House bills, *i.e.*, the bills that preceded the passage of TSCA in its final form, each contained provisions allowing the courts to award "reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate." *See* S. 3149, 94th Cong., 2d Sess. § 19(c)(3) (1976); H.R. 14032, 94th Cong., 2d Sess. § 19(c)(3) (1976), *reprinted in* Legislative History of the Toxic Substances Control Act, at 136, 384 (1976) (hereinafter "Legislative History"). Although minor modifications were made to section 19 in the conference between the Senate and House Managers of the TSCA bills, the Conference Committee ultimately retained intact the provision allowing for awards of "reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate." *Id.* at 709.

The only significant discussion of the attorneys' fee provision apparently occurred on September 28, 1976, during the Senate's consideration of the Conference Report. *Id.* at 721, 727–30. During this discussion, Senator Magnuson, who was the ranking Senate Manager on the Conference Committee, made it clear that the attorneys' fee provision "*is not restricted to plaintiffs or to successful parties.*" Legislative History at

---

**3.** 28 U.S.C. § 2412(d)(2)(A)(ii) adds that, in specified circumstances:

> (. . . . [A]ttorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)

However, it appears clear that the "$75 per hour" limit in 28 U.S.C. § 2412 is not applicable to fees awarded under TSCA. By its terms, section (d)(2) is limited to awards to parties who meet specified income or net worth criteria. 28 U.S.C. § 2412(d)(2)(B). For this special class of prevailing parties, Congress determined that an award "*shall*" be made "*unless* the court finds that the position of the United States was substantially justified or that spe-

cial circumstances make an award unjust," 28 U.S.C. § 2412(d)(2)(A) (emphasis added), although at the limited rates outlined in section (d)(2)(A).

More generally, 28 U.S.C. § 2412(b) states, in part, that "the United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law *or under the terms of any statute which specifically provides for such an award.*" (emphasis added).

In this case, EPA does not contend that EDF's attorneys' fee claim may be limited by reference to 28 U.S.C. § 2412(d)(2)(A)(ii). Indeed, at several places in the *EPA Response*, EPA acknowledges that EDF attorneys may be entitled to a rate above $75 per hour. *Id.* at 20–21.

729 (emphasis added). However, Senator Magnuson made a point of indicating that the attorneys' fee provision was not without limits:

It is not the intention of these provisions to provide an award for an individual or a group if that individual or group may stand to gain significant economic benefits through participation in the proceeding.

*Id.* at 729.[4]

In addition to his own remarks, Senator Magnuson sought and received consent to print the remarks of Senator Tunney (which had appeared in the Congressional Record of March 26, 1976), as part of the legislative history of section 19. *Id.* at 727. In his printed comments, Senator Tunney first stated that

[the attorneys' fee] provision [of TSCA] would allow an award of fees and costs to any party when "appropriate," *a word which should [be] liberally construed to effectuate the purposes of this act.*

*Id.* (emphasis added). Following this initial comment, Senator Tunney added that:

[I]n typical circumstances, the court should follow prevailing case law which holds that a successful plaintiff "should ordinarily recover in [sic] attorneys' fee unless special circumstances would render such an award unjust." . . . "Plaintiff" in the [sic] sense is used to mean the parties seeking to enforce the rights granted by this section and can include an intervenor, or a defendant in some cases. . . .

Where plaintiff's proceeding is brought in good faith or on the advice of component [sic] counsel, fees and costs would ordinarily be denied to a prevailing defendant. . . . The standard for awarding fees and costs to a prevailing defendant is not the same as for a plaintiff because, if it were, the risk to the average citizen of

bringing suit under this section would be so great it would discourage such suits.

Fees and costs would be awarded to a "successful plaintiff" under this provision where there was a final court order granting the relief requested by plaintiffs, or as a matter of interim relief pending the outcome of the case. The provision does not require the entry of a final order before fees or costs may be recovered. . . . Such awards are especially important where a party has prevailed on an important matter in the course of the litigation even where he does not ultimately prevail on all the issues. For purposes of the award of fees and costs, it is "appropriate" to make awards when the parties have [1] vindicated rights through consent judgment or [2] without formally obtaining relief, or [3] *where such award is in the public interest without regard to the outcome of the litigation.*

*Id.* at 727–28 (emphasis added) (citations omitted). Although Senator Tunney occasionally referred to "prevailing" or "successful" plaintiffs, these references—when read in context—cannot be seen to be inconsistent with his initial view that the attorneys' fee provision should be "liberally construed." *Id.* at 727. Nor do his remarks appear to be inconsistent with Senator Magnuson's view that the attorneys' fee provision "is not restricted to . . . successful parties." *Id.* at 729. This latter point is confirmed by Senator Tunney's observation that attorneys' fees may be "appropriate" "where the award is in the public interest without regard to the outcome of the litigation." *Id.* at 728.

The remaining remarks offered by Senator Tunney pertained to the appropriate measure of attorneys' fees. On this final point, he commented as follows:

---

**4.** Senator Magnuson added that the attorneys' fee provision "is . . . intended to discourage individuals who may stand to benefit economically from the proceeding from joining with other individuals for the purpose of forming an organization to obtain compensation for participation in an agency proceeding under this

Act." Legislative History at 729. He further stated that attorneys' fees would not be appropriate for "persons, including corporations or trade associations, that could otherwise afford to participate or whose economic interest in the outcome of a proceeding is not insubstantial." *Id.* at 730.

By specifying a general rule for the amount of fees to be awarded, this provision requires the method of calculating fees be no different than that now being utilized in other fields of law as, for example antitrust and securities regulation litigation. The "actual time" spent is that reasonably calculated to advance the client's interest. *The Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974), and the amount can be adjusted for factors including inter alia, the centingent [sic] nature of the success or the quality of the work performed. *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973), on remand, 382 F.Supp. 999 (E.D. Pa.1974), or benefits to the public from the suit. *Davis v. County of Los Angeles,* 8 E.P.D. 9444 (C.D.Cal.1974). Fees should not be reduced merely because the attorneys are salaried employees of public interest and or foundations-funded law firms.

Legislative History at 728.

With these general legislative standards in mind, we may now turn to the specific claims being advanced by EDF for attorneys' fees in this case.

### III. THE EDF CLAIMS FOR ATTORNEYS' FEES

A. *Time Claimed For Work On The Case-In-Chief*

The *EDF Motion* claims a total of 837.4 hours for the three attorneys who were assigned to and worked on the litigation in *EDF v. EPA,* broken down as follows:

William Butler, Esq. — 190.4 hours
Jacqueline M. Warren — 617.0 hours
David J. Lennett — 30.0 hours

*See EDF Motion, EDF Supplementary Motion* and *EDF Reply.* In an "Affidavit of Jacqueline M. Warren," accompanying the *EDF Motion,* it is indicated that Ms. Warren was a senior staff attorney at EDF, where she worked from June of 1973 until November of 1980. She graduated from Smith College in 1963 and from George Washington University National Law Center in 1972, where she ranked third in her class. At EDF, she was the principal staff attorney for the Toxic Chemicals Program, and participated in "many administrative and judicial proceedings concerning toxic chemicals." *Id.* at 1, 7–8.

William A. Butler was General Counsel of EDF when he participated in this case. He obtained a B.A. degree from Stanford University in 1963, a Master's degree from Oxford University in 1965, a J.D. degree from Yale University in 1969 and a Ph.D. from Harvard University in 1971. Mr. Butler was employed at EDF from 1970 until 1981 and, during that time, he "initiated, prepared and ultimately supervised the considerable amount of environmental litigation undertaken by EDF in federal district court and in courts of appeals." *Id.* at 9.

David J. Lennett graduated from George Washington University National Law Center in 1979, and has been employed as a staff counsel at EDF ever since then. Prior to his graduation, Mr. Lennett worked part time at EDF and assisted with environmental litigation. Following graduation, he became the principal EDF attorney on hazardous waste matters. *Id.* at 10.

In the extensive descriptions of the work performed by these three EDF attorneys, their hours on *EDF v. EPA* are broken down as follows:

| Category of Legal Work | Hours | | |
| --- | --- | --- | --- |
| | W. Butler | J. Warren | D. Lennett |
| Analysis of Final Regulation; Identification of Issues for Judicial Review; and Preparation of Petition for Review | | 42 | |
| Preparation of Motion to Defer Filing of Appendix; Review of Motions for Leave to Intervene and Consideration of Response | | 12 | |
| Preparation of Response to ALCOA Motion for Stay of Proceedings | | 7 | |
| Analysis of Record; Preparation of EDF Brief | | 226 | |
| Preparation of EDF Reply Brief; Preparation of Joint Appendix; and Preparation for Oral Argument | | 330 | |
| Monitoring of Post-Decision Petitions for Rehearing | 16 | | |
| Preparation for and Attendance at Negotiations w/Respondent and Industry Regarding Stay of Decision Pending Further Rulemaking; Participation in Joint Petitions for Stay of Mandate | 174.4 | | |
| Preparation of Materials to Request Attorneys' Fees | | | 30 |
| TOTAL | 190.4 | 617 | 30 |

*See EDF Motion* ("Memorandum of Points") at 4, *EDF Supplementary Motion,* and *EDF Reply.* The *EDF Supplementary Motion* (which contains a lengthy document entitled "Supplementary Declarations In Support of Petitioner EDF's Motion For Attorneys' Fees") sets forth in great detail the attorneys' time logs and narrative descriptions of all legal work done by each attorney.

Following the guidelines set forth in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980) (en banc), discussed *infra* in section III–B, EDF has made the following claim for attorneys' fees:

| Attorney | Experience | Hours | Rate/Hr. | Total |
|---|---|---|---|---|
| William A. Butler | 11 yrs. | 190.4 | $110 | $ 20,944.00 |
| Jacqueline M. Warren | 9 yrs. | 617 | $ 90 | $ 55,530.00 |
| David J. Lennett | 2 yrs. | 30 | $ 55 | $ 1,650.00 |
| | | "Lodestar" | = | $ 78,124.00 |
| | | "Lodestar" Amplification | = | $156,248.00 |

### B. *The Decision In Copeland v. Marshall*

In submitting a claim of $156,248.00 for attorneys' fees for work done on the case in chief, EDF relies heavily on the decision in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980) (en banc).[5] Under *Copeland,* the attorneys' fee is computed by first determining the "lodestar," *i.e.,* the number of hours reasonably expended multiplied by a reasonable hourly rate. The "lodestar" fee may then be adjusted up or down to reflect the quality of representation and the contingent nature of success. *Id.* at 891–94.

As to the factor of "hours reasonably expended," *Copeland* states that:

Compiling raw totals of hours spent ... does not complete the inquiry. It does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended .... Thus, no compensation is due for nonproductive time. For example, where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time ....

. . . .

The reasonable hourly rate is that prevailing in the community for similar work

.... [A] reasonable hourly rate is the product of a multiplicity of factors[:] ... the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case. It follows that there may be more than one reasonable hourly rate for each of the attorneys, and for each of the kinds of work, involved in the litigation.

641 F.2d at 891–92 (emphasis in original) (citations omitted).

Concerning adjustments to the "lodestar" attributable to "the contingent nature of success," 641 F.2d at 892, the decision in *Copeland* observes that:

Under statutes like Title VII, only the prevailing party is eligible for a court-awarded fee. An attorney contemplating representation of a Title VII plaintiff must recognize that no fee will be forthcoming unless the litigation is successful. An adjustment in the lodestar, therefore, may be appropriate to compensate for the risk that the lawsuit would be unsuccessful and that no fee at all would be obtained.

It is important to recognize that the contingency adjustment is designed solely to compensate for the possibility at the outset that the litigation would be unsuccessful and that no fee would be obtained.

641 F.2d at 892–93. Since, as has already been indicated, attorneys' fees may be awarded to "prevailing," "substantially prevailing" or "non-prevailing" parties under TSCA, this portion of the "contingent nature of success" factor discussed in *Copeland* is irrelevant in this case.

The court in *Copeland* also included a factor of "delay" under the heading of "contingent nature of success." On this point, *Copeland* states:

The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment. The hourly rates used

---

5. *Copeland* involved the standards to be applied in awarding attorneys' fees against the government under section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) (1976).

in the "lodestar" represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate.

*Id.* at 893.

Finally, regarding adjustments to the "lodestar" for "quality of representation," *Copeland* holds that:

A quality adjustment is appropriate only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the "lodestar." In other words,

the court must recognize that a consideration of "quality" inheres in the "lodestar" award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hour rates superior to those who are less endowed. Thus, the quality of an attorney's work *in general* is a component of the reasonabl[e] hourly rate; this aspect of "quality" is reflected in the "lodestar" and should not be utilized to augment or diminish the basic award under the rubric of "the quality of an attorney's work."

*Lindy I*, then permits an adjustment to the "lodestar"—up or down—based on the all-around performance of counsel in the specific case: "Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good." 487 F.2d at 168. . . .

*Lindy II*, 540 F.2d at 117–18 (emphasis in original).

Until now the calculations have entirely ignored the results of the litigation.

Success was a threshold inquiry relevant to the entitlement *vel non* to a fee, but the amount or nature of recovery was not considered in setting the "lodestar." These latter factors should be considered now, under the rubric of "quality of representation."

Where exceptional results are obtained—taking into account the hourly rate commanded and number of hours expended—an increase in fee is justifiable. . . .

Quality adjustments may be upward or downward. Thus, if a high-priced attorney performs in a competent but undistinguished manner, a decrease in the "lodestar" may be necessary under the "quality of representation" rubric because the hourly rate used to calculate the "lodestar" proved to be overly generous.

641 F.2d at 893–94.

■ In considering the relevance of *Copeland*, there is one point that must be emphasized. As noted above, *Copeland* involved a claim for fees under Title VII, a statute under which the "*prevailing party*" may seek "a reasonable attorney's fee as a part of costs." 42 U.S.C. § 2000e–5(k) (1976). TSCA, on the other hand, allows for "reasonable attorneys' fees" "if the court determines such an award is appropriate." 15 U.S.C. § 2618(d). The legislative history of this provision indicates that the attorneys' fee provision in TSCA "is not restricted to . . . successful parties," and that an award of attorneys' fees may be "appropriate" "where such award is in the public interest without regard to the outcome of the litigation." Legislative History at 728–29. Thus, while "success" in litigation may be a factor in determining whether an adjustment to the "lodestar" is due, it is not determinative of the question of whether any fee is due. Excluding this point, we believe that *Copeland* is a controlling precedent that must be followed in this case.

C. *EPA's Opposition To The Claim For Attorneys' Fees*

As noted at the outset of this opinion, EPA principally argues that EDF's claim

should be strictly scrutinized, that the estimated "lodestar" fee is exaggerated, and that no upward adjustment to the "lodestar" is warranted. There is no serious claim that EDF is not entitled to some amount of attorneys' fees.

Specifically, EPA has raised the following issues:

(1) "[A] substantial portion of Ms. Warren's hours must be deemed as "unproductive" time because it was devoted to pursuit of 2 of 4 claims upon which EDF did not prevail." *EPA Response* at 14.

(2) "Ms. Warren's and Mr. Butler's hours should be discounted because portions of both were devoted to EDF efforts relating to issues raised by the industry intervenors." *Id.*

(3) EPA should not be "taxed with attorneys' fees relating to post-decision negotiations." *Id.* at 17.

(4) "Should the Court disagree that Mr. Butler's hours for participating in settlement negotiations be entirely disallowed, it should still substantially reduce the total of these 176 hours as being unnecessary to a fair pursuit of the matter." *Id.* at 18.

As an alternative proposal to EDF's claim on hours, EPA suggests that the following time should be *excluded* from the "lodestar:"

(1) 75% of 12 hours claimed by Ms. Warren for preparation of the motion to defer filing of appendix and to review motions to intervene.

(2) All 7 of the hours claimed by Ms. Warren for preparation of responses to Alcoa's Motion to Stay.

(3) 25% of 330 hours for preparation of reply brief and oral argument.

(4) All 16 hours spent by Mr. Butler to monitor intervenors' petitions for rehearing.

(5) 50% of Ms. Warren's remaining time because EDF prevailed on only two of four claims.

(6) At least 50% of the 176 hours claimed by Mr. Butler for post-decision settlement negotiations.

In sum, EPA argues that the number of "hours reasonably expended" for each attorney should be adjusted as follows:

| Attorney | EDF Claim | EPA Proposal |
|---|---|---|
| Mr. Butler | 190.4 | 0–88 |
| Ms. Warren | 617 | 260 |
| Mr. Lennett | 30 | 30 |
| TOTAL | 837.4 | 290–378 |

In addition, EPA argues that "EDF's suggested rates should be reduced to reflect the fact that much of the time consumed by its three counsel appears to have included neither 'in-court' time, nor other core litigation activity, such as brief writing." *EPA Response* at 20. EPA thus urges that the rates for EDF attorneys should be adjusted downwards as follows:

| Attorney | EDF Claim | EPA Proposal |
|---|---|---|
| Mr. Butler | $110.00 | $82.50 |
| Ms. Warren | 90.00 | 75.00 |
| Mr. Lennett | 55.00 | 55.00 |

*EPA Response* at 21.

Finally, EPA contends that there should be no upward adjustment in the "lodestar" because (1) "the efforts of EDF's counsel were substantially within the range of skill normally expected of attorneys receiving the rates that they suggest," *id.* at 22; (2) "the burden faced by EDF . . . is the standard burden of any litigant in an administrative agency case," *id.* at 25; and (3) "no contingency adjustment would be warranted here for delay in renumeration [because] EDF has only recently submitted its requests for fees" and because "the hourly rates they suggest are derived from other recent decisions and, therefore, reflect current market values." *Id.* at 25.

## IV. AN EVALUATION AND JUDGMENT CONCERNING THE "HOURS REASONABLY EXPENDED," THE "REASONABLE HOURLY RATE," AND "ADJUSTMENTS TO THE 'LODESTAR' "

Having outlined the applicable statutory standard, the controlling judicial precedents

(as set forth in *Copeland*) and the contentions of the parties, we now may proceed to determine the merits of EDF's claim for attorneys' fees.

## A. Documentation

■ EPA initially argues that EDF's claim should be rejected for "lack of adequate documentation." *See* note 2 *supra.* For the reasons hereafter enumerated, we reject this contention as wholly untenable on the record before us.

In *Copeland*, this court stated that, with respect to "documentation" of attorneys' fee claims, the party seeking a fee should submit information that will allow the reviewing court to "segregate into categories the kinds of work performed by each participating attorney." 641 F.2d at 891. The court added that:

> It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought.

*Copeland*, 641 F.2d at 891 (quoting from *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)).

The documentation furnished by EDF in this case is *more* than enough to satisfy the test set forth in *Copeland*. Here, petitioner has submitted

(1) daily time sheets for attorneys Warren and Butler;

(2) written declarations from attorneys Warren, Butler and Lennett describing in detail the precise nature of the work performed by them, the hours attributed to each category of work, the approximate numbers of hours discounted as potentially "duplicate" or "nonproductive" and the approxi-

mate dates when each category of work was performed;

(3) an affidavit from Jacqueline Warren describing the history of the litigation, the litigation goals and strategies of EDF, and the qualifications of each of the participating attorneys; and

(4) citations to authorities to justify the reasonableness of the hourly rates claimed for each attorney.

*See EDF Motion* (including "Memorandum of Points" and "Affidavit of Jacqueline M. Warren"), *EDF Supplementary Motion* (including "Supplementary Declarations"), and *EDF Reply.* We have considered this information with care and we find it sufficient to allow us to judge the reasonableness of the hours expended. Indeed, we believe that petitioners in this case have furnished more detailed information than was required by this court in *Copeland*. (*See* discussion at 641 F.2d 902 for a review of the documentation considered in *Copeland.*)

■ We agree with EPA that, as an appellate court (without the benefit of pre-trial motions, discovery supervision, and extended courtroom hearings comparable to what a district judge might experience), we should scrutinize an attorneys' fee claim with particular care. We also note, however, as did the court in *Copeland*, that "[o]ther circuit courts of appeals have observed that appellate judges are themselves experts in assessing the reasonableness of an attorney's fee award, and that the appellate court ... may independently review the record, or itself set the fee." 641 F.2d at 902 (footnotes omitted). Since, under TSCA, we are obliged to "independently review the record" and "set the fee," we have undertaken this responsibility and pursued the task with care. We have no doubt that, had it been necessary, we could have requested further documentation from the parties or scheduled hearings before designated members of the panel. In this case, however, since the documentation furnished by EDF is more than adequate, we are confident that we have enough information to complete the task before us.

B. *Hours Reasonably Expended*

1. *EPA's Request To Reduce Hours In Connection With Work Performed On Issues Upon Which EDF Did Not Prevail*

 EPA asserts that, under *Copeland*, EDF should not receive attorneys' fees for time spent litigating claims upon which petitioners did not prevail. For the reasons already given at the conclusion of section III–B *supra*, we reject this contention.

First, to reiterate, attorneys' fees under TSCA are not restricted to "successful parties." Legislative History at 729. Furthermore, because we find that the litigation in *EDF v. EPA* involved critically important and difficult issues of first impression, and that the outcome of the litigation greatly served the public interest, we hold that there should be no discount in the fees awarded simply because EDF failed to prevail on one of three closely-related issues. At the conclusion of a 41-page slip opinion in *EDF v. EPA*, the court highlighted the significance of the litigation with the following observation:

> We feel constrained to add one final note to emphasize our concern in this case. Human beings have finally come to recognize that they must eliminate or control life threatening chemicals, such as PCBs, if the miracle of life is to continue and if earth is to remain a living planet. This is precisely what Congress sought to do when it enacted section 6(e) of the Toxic Substances Control Act. Yet, we find that forty-six months after the effective date of an act designed to either totally ban or closely control the use of PCBs, 99% of the PCBs that were in use when the Act was passed are still in use in the United States. With information such as this in hand, timid souls have good reason to question the prospects for our continued survival, and cynics have just cause to sneer at the effectiveness of governmental regulation.

The EPA regulations can hardly be viewed as a bold step forward in the battle against life threatening chemicals. There is no substantial evidence in the record to support certain of the EPA regulatory enactments, and portions of the regulations are plainly contrary to law. Thus, the effort by EPA has, in certain respects, fallen far short of the mark set by the congressional mandate found in section 6(e) of the Toxic Substances Control Act.

636 F.2d at 1286–87 (footnote omitted). We think that there can be no doubt regarding the point that the public interest was well served by EDF's litigation in *EDF v. EPA.*

Even with respect to the "use authorization" issue alone, *see* 636 F.2d at 1275, upon which EDF did not prevail in *EDF v. EPA*, we find that the efforts of EDF nevertheless benefitted the public interest. The questions pertaining to the "use authorization" regulations were highly detailed, difficult, important and hardly frivolous. The resolution of these questions was important in determining under what circumstances and to what extent TSCA permits EPA to authorize by rule non-totally enclosed uses of PCBs.

In light of all of these considerations and in light of the fact that the "use authorization" issue was intimately related to other issues in the case, we reject EPA's request for a reduction in hours because of EDF's failure to prevail on one issue.[6]

2. *EPA's Request To Reduce Hours In Connection With Work Performed On Issues Raised By Industry Intervenors*

 EPA contends that the hours logged by both Ms. Warren and Mr. Butler in litigating against intervenors should not be charged to EPA. Apart from the 16 hours claimed for Mr. Butler for "monitoring of post-decision petitions for rehearing,"[7] we reject EPA's position.

---

6. We believe that, in this case, any adjustment to be made because of EDF's failure to prevail on one issue should occur in connection with the consideration of "adjustments to the lodestar."

7. Since we can find no explanation of this item,

As has been accurately noted in the *EDF Reply*, "[h]ere, even where intervenors or the amicus curiae raised points not specifically made by EPA, EDF's responses were largely made in terms directly applicable to EPA and its arguments." *Id.* at 23. In addition, it was critical for EDF to respond to and prevail on the jurisdictional challenge raised by the Electronic Industries Association in order to reach the merits of the issues raised in *EDF v. EPA*.

EPA argues that the "agency is not in privity with the intervenors, did not control or direct their presentations to the Court, and EDF did not oppose these interventions." *EPA Response* at 15. What is more important, however, is that all of the positions advanced by the intervenors were in defense of the disputed EPA regulations. Furthermore, there is no suggestion that EDF counsel did any duplicate work in responding to the arguments raised by intervenors as opposed to those raised by EPA. Finally, and most significantly, EPA never opposed any of the positions asserted by the intervenors.[8] In view of these considerations, we can find no merit in EPA's position.

3. *EPA's Request To Reduce Hours In Connection With Work Performed During Post-Decision Negotiations*

■ EPA contends that the agency should not be "taxed with attorneys' fees relating to post-decision negotiations." *EPA Response* at 17. When considered in the context of the specific litigation here in question, this claim by the agency borders on being frivolous. Accordingly, we reject it.

We need look no further than the *EPA Response* for an accurate description of the post-decision events that are critical to our inquiry on this point:

The result of the Court's decision [in *EDF v. EPA*] placed the industry users of PCBs in a difficult posture. Section 6(e), TSCA, contains broad prohibitions on the manufacture, processing, distribution, and use of PCBs. Portions of EPA's PCB Ban Rules which this Court invalidated would have had the effect of softening the impact of the prohibitions of Section 6(e). If the Court's mandate had issued as scheduled on December 22, 1980, the strict prohibitions of Section 6(e) would have taken effect immediately. These prohibitions would have had far-reaching impact. The full impact of these prohibitions was not known, but EPA and EDF believed that, if the Court's mandate had issued, any person using a transformer or capacitor containing any concentration of PCBs would have been in violation of Section 6(e) unless the person discontinued these operations.

Issuance of the Court's mandate would have had a serious impact on activities which create PCBs as well as on the use of PCBs. PCBs in concentrations below 50 ppm are generated in numerous manufacturing processes. Issuance of the Court's mandate would have disrupted these manufacturing activities. Moreover, statutory prohibitions extend beyond the manufacture of PCBs to the processing, distribution in commerce, and use of products containing any concentration of PCBs. Issuance of the Court's mandate would have had substantial immediate impact upon persons engaged in these activities.

In addition to the problems posed to users of PCBs from immediate issuance of the mandate, the Court's decision instructed EPA to build a sufficiently reliable factual record before promulgating new regulations covering the totally enclosed uses of PCBs or dealing with the

___

other than the categorical notation, and since there is no claim that Mr. Butler completed any legal research or drafting in connection with petitions for rehearing, we find the claim for 16 hours to be excessive. We therefore reduce the allowed time for this item to 4 hours.

8. While it is true that EPA and the industry intervenors were not, in a formal sense, acting in privity, it is clear from the history of the litigation in this case that their positions have been closely aligned.

complex problem of PCBs in low concentrations. Each of the parties to the prior litigation recognized that developing new rules would require the generation of a great amount of new factual material.

To assure that the development of new PCB rules did not cause needless disruption of major segments of the economy while, at the same time, reducing the risks of PCB exposure, EPA, EDF, and the industry intervenors, and other persons affected by the Court's decision held an extended series of meetings between November, 1980 and February, 1981.

These meetings resulted, *inter alia*, in the filing of three joint motions to the Court. These motions requested the court to stay issuance of its mandate, while EPA conducted new rulemaking with respect to PCBs and while industry groups undertook activities related to the new rulemaking.

On February 12, 1981, the Court entered an order in response to a joint motion of January 21, 1981. The February 12 order adopted a plan for EPA to conduct new rulemaking on uses of PCBs that EPA's previous rules had characterized as "totally enclosed," and required that persons continuing to use electrical equipment must adhere to the terms of a temporary risk-reduction regime called the "Interim Measures Program." The February 12 order also required the EEI to conduct a study relating to the use of PCBs in electrical equipment and to submit the study to EPA for the record of the Agency's new rules that would address the use of PCBs in such equipment. This order also required EPA to announce a proposed rule on this issue no later than 60 days after submission of the EEI study to EPA and to promulgate a final rule within 60 days after the expiration of a sixty-day comment period on the proposal. The study is to be submitted to EPA by January, 1982.

On April 13, 1981, the Court entered an order in response to a joint motion that was submitted on February 20, 1981. The April 13 order adopted a plan for further action by EPA and industry groups leading towards new rulemaking on the regulations of PCBs in concentrations below 50 ppm. The April 13 order required EPA: (1) to publish two ANPR's in the *Federal Register*; (2) within 18 months from the date of the order, to promulgate a final rule allowing for the generation of PCBs in "closed manufacturing processes" or only as constituents of "controlled wastes," or to explain the reasons for not proceeding with such a rule; and (3) within eleven months after the date of the order, to advise the Court of EPA's plans and schedule for further action on PCBs in concentrations below 50 ppm generated other than in "closed manufacturing processes" or as constituents of "controlled wastes." EPA published the ANPR's required by the April 13 order on May 20, 1981. (46 Fed.Reg. 27614).

*EPA Response* at 3–6.

As may be seen from EPA's own description, following the court's decision in *EDF v. EPA*, (1) the parties (including both EDF and EPA) participated in extensive deliberations and negotiations in order to seek a stay of the mandate and develop a program to achieve a revised regulatory scheme; (2) a stay of the mandate was issued, and court jurisdiction retained, pursuant to *joint* motions submitted by the parties; (3) the post-decision events were intimately related to the litigation in the case-in-chief; and (4) the continued participation of EDF in the post-decision deliberations was essential to a successful resolution of this litigation.[9] With these facts in mind, we cannot take seriously EPA's assertion that EDF is barred from claiming attorneys' fees for post-decision negotiations work.[10]

---

**9.** For example, if EDF had not joined in the request for a stay of the mandate, there is no assurance that the court would have granted the request without further hearings and/or briefs. In either event, the continued participa-

tion of EDF was essential to a successful resolution of the case.

**10.** Essentially for the reasons stated in the *EDF Reply* at 28–29, we can find no merit in EPA's claim that the 176 hours claimed for Mr. But-

## C. *The Reasonable Hourly Rates*

As noted above, EDF has requested rates of $110/hour, $90/hour and $55/hour for Mr. Butler, Ms. Warren and Mr. Lennett, respectively. EPA has countered with rate proposals of $82.50/hour, $75/hour and $55/hour. EPA does not seriously contest the accuracy of rates cited by EDF insofar as "market value" is concerned.[11] Rather, EPA principally contends that the court should distinguish between "in-court," "out-of-court," and "travel" time, and that the rates claimed for Mr. Butler and Ms. Warren should be reduced because most of their work in this case involved non-court time.[12]

■ Whatever there is to be said about "travel time" can await another day; it is conceded that "travel time" is not a significant factor in this case. As for the distinction sought between "in-court" and "out-of-court" time, the simple answer is that *Copeland* does not compel any such rate differentiations. Rather, in determining "market value," the decision in *Copeland* focuses on (1) level of skill necessary, (2) time limitations, (3) the amount to be obtained in the litigation, (4) the attorney's reputation, and (5) the undesirability of the case. 641 F.2d at 892. *Copeland* does indicate that "there

may be more than one reasonable hourly rate for each of the attorneys, and for each of *the kinds of work*, involved in the litigation." *Id.* (emphasis added). The emphasis, however, is on a general reference to "kinds of work," not "in-court" versus "out-of-court" work.

■ In this case, given the importance of the post-decision negotiations, the high level of skill required (to maintain a litigation victory and yet accommodate to the legitimate needs and interests of numerous intervenors and a federal agency), the significant public interest value of the litigation, and the going "market value" for the services of a lawyer with like experience and skills, we find that the $110/hour rate claimed for Mr. Butler is perfectly reasonable. Taking into account like considerations, we also find that the rate of $90/hour claimed for Ms. Warren is quite reasonable. EPA does not contend that any of Ms. Warren's time was frivolous, insignificant or unrelated to the litigation. Indeed, it appears that she was principally responsible for marshalling and implementing the entire EDF litigation strategy.[13] Thus, it seems to us that EPA's focus on non-court time misses the mark. Ms. Warren did

---

ler's participation in post-decision negotiations should be reduced. Mr. Butler's hours are adequately documented and, as correctly noted by EDF, the agency challenges to these hours are patently flawed.

**11.** In the *EPA Response*, the agency concedes that the hourly rates suggested by EDF "are derived from other recent decisions and, therefore, reflect current market values." *Id.* at 25.

EDF relies heavily on *North Slope Borough v. Andrus*, 515 F.Supp. 961 (D.C.C.1981), in which the District Court Judge made an inquiry as to the prevailing rates for environmental litigation in the Washington, D. C. area. Following this inquiry, the court in *North Slope Borough* approved rates—consistent with those prevailing in the community—as follows:

| | | |
|---|---|---|
| Very Experienced Attorney | (over 20 years) | $125/hour |
| Experienced Attorney | (over 9 years) | $110/hour |
| Less Experienced Attorney | (4-8 years) | $80/hour |
| Inexperienced Attorney | (under 4 years) | $65/hour |

515 F.Supp. at 966–70.

In the *EPA Response to Supplementary Motion*, EPA submitted a list of cases intended to prove that "the weight of available evidence shows that the prevailing fee rate for civil liti-

gation compensable under federal attorneys' fee award statutes in this District is below $100/hour for even core litigation time." *Id.* at 9. However, a majority of the cases cited (31 of 54) were decided before 1981, and many of the recent 1981 cases involve rates plainly comparable to those requested here. Furthermore, EPA has failed to indicate any breakdown in these cases for relative fees awarded for different classes of attorneys (*i.e.*, experienced, inexperienced, etc.), and there is no evidence to support the claim that lower fees are awarded for "out-of-court" work. If anything, the submission by EPA tends to support EDF's claim on rates.

**12.** It should be emphasized that EPA does *not* contend that EDF attorneys should have different rates for different portions of the work that each performed. Rather, EPA suggests a *single rate* for both Mr. Butler and Ms. Warren, albeit lower than the ones claimed by EDF.

**13.** It is true that Ms. Warren drafted several routine pleadings. However, the time involved for this work is too miniscule to be separated and allocated at a different rate.

most of the very substantial work on the EDF briefs and this work certainly was no less significant to the success of the litigation than was her oral presentation to the court. Since the rate claimed for Ms. Warren appears to be well within the range of the "market value" for a person of her experience performing the type of work at issue here, we shall grant the request for 617 hours at $90/hour.[14]

We should add that, with respect to the rates claimed for all three EDF attorneys, we are also influenced by the factors cited in the legislative history of section 19(d) of TSCA. *See* Legislative History at 728. We note in particular that EDF did not "stand to gain significant economic benefits through participation in the proceeding." *Id.* at 729. As a public interest group, relying heavily on private donations and attorneys' fees in cases such as this one, EDF cannot be considered to be an association "that could otherwise afford to participate," in the sense that that condition is intended in the legislative history. *Id.* at 730.

We also note that the legislative history cites *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973), *on remand*, 382 F.Supp. 999, *aff'd in part and vacated in part*, 540 F.2d 102 (3d Cir. 1976), Legislative History at 728, a case heavily relied upon by this court in *Copeland*. *See, e.g.*, 641 F.2d at 890–94, 902–03. The citation to *Lindy* is significant because the Third Circuit, just as did this court in *Copeland*, endorsed a "market value" approach in fee-setting. 487 F.2d at 167.

Finally, the legislative history makes it clear that "[f]ees should not be reduced merely because the attorneys are salaried employees of public interest and or foundations-funded law firms." Legislative Histo-

ry at 728. This factor is, of course, relevant here in the light of EDF's institutional status as a public interest organization.

As a final point of emphasis, we reiterate that EPA has made only a feeble challenge to the specific hourly rates claimed by EDF. *See* note 11 *supra*. There is no contention that EDF has failed to follow the "market-value" approach adopted in *Copeland*. EPA has disputed the rates cited by EDF, but we have found this challenge to be wanting. *Id.*[15]

### D. Calculation Of The "Lodestar" Fee

In the light of our holdings above, the "lodestar" fee in this case is calculated as follows:

| Attorney | Hours | Rate/Hour | Total |
|----------|-------|-----------|-------|
| William A. Butler | 178.4 | $110 | $19,624.00 |
| Jacqueline M. Warren | 617 | $ 90 | $55,530.00 |
| David J. Lennett | 30 | $ 55 | $ 1,650.00 |
| | "Lodestar" Fee | --- | $76,804.00 |

### E. Adjustments To The "Lodestar"

■ *Copeland* holds that the "lodestar" may be adjusted to reflect "the contingent nature of success" and the "quality of representation."[16] The legislative history of section 19(d) of TSCA adds a third factor that may be considered with respect to any proposed adjustment: "benefits to the public from the suit." Legislative History at 728.

Following these guidelines, EDF has argued at length that the "lodestar" fee should be doubled. We agree that there should be a modest adjustment, in the neighborhood of 15–20%, to reflect "benefits to the public from suit," Legislative History at 728, and "the delay in receipt of payment for services rendered." *Copeland*, 641 F.2d at 893. However, we believe that any greater adjustment would be excessive given the circumstances of this case.

---

**14.** Because there is no real challenge to the rate claimed for Mr. Lennett, and because the amount is clearly reasonable on the facts of this case, we approve the full amount requested for him.

**15.** At one point, EPA virtually concedes the validity of EDF's claim on rates by arguing that, "[h]ere, the efforts of EDF's counsel were

substantially within the range of skill normally expected of attorneys receiving the rates that they suggest." *EPA Response* at 22.

**16.** "The burden of justifying any deviation from the 'lodestar' rests on the party proposing the deviation." *Copeland*, 641 F.2d at 892.

EDF cites *Keith v. Volpe*, 86 F.R.D. 565 (C.D.Cal.1980), in support of its request for a doubling of the "lodestar." *Keith*, like this case, was a case of first impression, involving an interpretation of the California Environmental Quality Act of 1970. There, the plaintiffs successfully sought an order enjoining the construction of a massive freeway project principally because of its environmental impact. In applying a 3.5 multiplier of the "lodestar," the court in *Keith* noted that plaintiffs' counsel "provided first-rate legal services in successfully advocating the protection of the environmental and human interests at stake." *Id.* at 574. We find *Keith* instructive but not determinative. Here, we are bound to follow *Copeland* and the guidelines set forth in the legislative history surrounding section 19(d) of TSCA.

The two factors that we rely on to increase the "lodestar" from $76,804 to $90,000, *i.e.*, approximately 17%, are public benefit and delay in receipt of payments. As we have already noted several times, it is clear that EDF's pursuit of this litigation greatly benefitted the public interest. TSCA was designed by Congress to "eliminate or control life threatening chemicals, such as PCBs," and the action by EDF helped to demonstrate that the regulatory "effort by EPA [had], in certain respects, fallen far short of the mark set by the congressional mandate found in section 6(e) of the Toxic Substances Control Act." *EDF v. EPA*, 636 F.2d at 1286–1287. The benefit to the public is obvious and EDF is entitled to an upward adjustment in the "lodestar" for their litigation efforts.

Likewise, an upward adjustment, albeit modest, is also due for the delay in the receipt of attorneys' fees. As this court noted in *Copeland* :

> The hourly rates used in the "lodestar" represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long

in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate.

641 F.2d at 893. While we believe that some increase is due for delay, we have limited the amount because of three factors. First, the hourly rates claimed by EDF are current market rates, not those in effect when the case was litigated. Second, EDF did not file its claim for attorneys' fees until August 1981 and a portion of the documentation was not presented until October 1981 (in the *EDF Supplementary Motion* and the *EDF Reply* ). Finally, the actual period of delay, from the time when all documentation was submitted until EDF is actually paid, should be no more than six months.

As for EDF's additional claims in support of a greater increase in the "lodestar fee," we must reject them for several reasons. Apart from the delay factor, nothing more is due for "the contingent nature of success" because EDF did not have to "prevail" in order to obtain attorneys' fees under TSCA. This clearly distinguishes this case from the situation posed in *Copeland*. See 641 F.2d at 892–93. "The contingency adjustment is a percentage increase in the 'lodestar' to reflect the risk that *no fee* will be obtained." *Id.* at 893 (emphasis added). In this case, we believe that there was little or no risk that "no fee" would be obtained.

As to "quality of representation," we agree with the position of EPA that "EDF's counsel performed at [levels] of proficiency that [were] within the usual range of these experienced lawyers' skills." *EPA Response* at 24. We also agree that the legal burden faced by EDF in this litigation was "the standard burden of any litigant in an administrative agency case." *Id.* at 25. It is true that the case was extremely important and very complicated, and that EDF counsel performed with great skill; however, these factors are fully compensated by the amounts credited under the categories

of "hours reasonably expended" and "reasonable hourly rates."

Finally, we must also consider the "results of the litigation." *Copeland*, 641 F.2d at 894. Although petitioners need not "prevail" in order to claim attorneys' fees under TSCA, we believe that "non-prevailing" is a factor that should militate against upward adjustments in the "lodestar." Here, EDF lost on one of three issues decided by the court in *EDF v. EPA*. The issue was hardly insignificant and, therefore, it cannot be ignored in our calculations.

In sum, we find that EDF should receive an upward adjustment of 15–20% in the "lodestar" fee, in recognition of the critically important public benefits of the litigation and to compensate for delay in payment. However, for the reasons cited, we must reject the request by EDF for an increase in the "lodestar" by a factor of two.

## V. THE AWARD OF ATTORNEYS' FEES ON THE CASE–IN–CHIEF

In the light of our holdings above, the award of attorneys' fees to EDF for work on the case-in-chief shall be as follows:

| Attorney | Hours | Rate/Hour | Total |
|---|---|---|---|
| William A. Butler | 178.4 | $110 | $19,624.00 |
| Jacqueline M. Warren | 617 | $ 90 | $55,530.00 |
| David J. Lennett | 30 | $ 55 | $ 1,650.00 |
| "Lodestar" fee | | — | $76,804.00 |
| Upward Adjustment | | — | 17.18% |
| Total Award | | — | $90,000.00 |

## VI. TIMELINESS OF EDF'S REQUEST FOR ATTORNEYS' FEES

Intervenor AC Paper & Film Capacitor has filed a special opposition to EDF's motion for attorneys' fees, contending that fees should be denied because EDF's request "is over nine months out of time." *AC Paper Opposition* at 4. In particular, AC Paper cites Rule 39(c) of the Federal Rules of Appellate Procedure. Finding no merit in this claim, we reject it.

Initially, we would indicate that we doubt that AC Paper has any standing to raise a timeliness claim on fees that will be assessed solely against EPA. We need not decide this issue, however, because the claim is patently without merit. Rule 39(c)

covers only "costs," not attorneys' fees. We are unwilling automatically to apply the 14-day limitations period from Rule 39 in connection with a statutory fee provision. There is no specific limitations period for the submission of attorneys' fees claims under section 19(d) of TSCA. The statute simply provides that fees may be awarded "if the court determines that such an award is appropriate." This standard gives a court discretion to consider the reasonableness of attorneys' fees claims and, if "appropriate" (considering traditional equitable principles), to reject claims as untimely filed.

EPA has not contended that it was unreasonable for EDF to file for attorneys' fees when they did. Furthermore, given the extensive and complicated history of the litigation in this case (including elaborate post-decision proceedings), we do not believe that any such claim would be justified. All things considered, the timeliness claim of AC Paper must be denied.

## VII. THE ATTORNEYS' FEE CLAIM PERTAINING TO THE SUPPLEMENTAL FEE APPLICATION OF EDF FOR THE SERVICES OF TRILLING & KENNEDY

The final issue to be decided here involves the supplemental attorneys' fees application of EDF for legal services performed by Trilling & Kennedy. *See EDF Reply* at 46–48, and *EDF Supplementary Motion.*

On October 5, 1981, EDF and Trilling & Kennedy executed a retainer agreement, whereby Trilling & Kennedy agreed "to perform all required legal services in connection with an application for attorneys' fees with respect to" the *EDF v. EPA* litigation. *See* "Supplementary Declarations" in the *EDF Supplementary Motion.* The agreement also stated that "the parties . . . consider $110 per hour to be a reasonable hourly rate for the services of Trilling & Kennedy." *Id.*

Pursuant to this agreement, Trilling & Kennedy prepared and submitted the *EDF Reply*, a "Motion For Leave to File Motion for Attorneys' Fees Out of Time," and the

*EDF Supplementary Motion* (with attachments). For this work, EDF has claimed 11.2 hours for Mr. Kennedy [17] and 73.60 hours for Mr. Trilling,[18] for a total of 84.8 hours. The hourly rate requested is $110/hour, with a "lodestar" amplification of 50%. *EDF Reply* at 48–49. Thus, the "lodestar" fee for Trilling & Kennedy is $9,328.00, and the total fee requested (with the 50% amplification) is $13,992.00.[19]

### A. EDF Entitlement To An Award Of Attorneys' Fees For Time Spent In Preparing The Application For Fees

 EDF, relying on *Chrapliwy v. Uniroyal, Inc.,* 509 F.Supp. 442 (N.D.Ind.1981), and other like decisions, submits that "it is well established that time reasonably devoted to obtaining attorneys' fees in the context of litigation where the court must be petitioned for such an award is itself subject to the award of attorneys' fees." *EDF Reply* at 46. In *Chrapliwy,* the court noted that:

> Petitioners request compensation for 581 hours devoted to preparing this fee application and supporting documentation.... Payment for time spent preparing an attorney's fee application was recently approved by the Seventh Circuit in *Bond v. Stanton,* 630 F.2d 1231 (7th Cir. 1980). Although that decision was based upon the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. § 1988, its reasoning is dispositive of the issue here.

509 F.Supp. at 454. The EPA neither disputes the general principle stated by EDF nor the relevance of *Chrapliwy* and like decisions. Within bounds, we accept the basic contention of EDF, *i.e.,* that time reasonably devoted to obtaining attorneys' fees in the context of litigation *where the court must be petitioned for such an award* is itself subject to an award of fees.

For us, the critical fact here is that EDF was required to seek a court award of attorneys' fees under TSCA. The attorneys' fee question has, as a consequence, become one of the issues of the case. EDF, therefore, should be entitled to receive just attorneys' fees for time reasonably expended to resolve the matter in dispute if the court otherwise determines such fees to be appropriate.

If EPA had been willing to pay attorneys' fees on EDF's original submission in August of 1981, *see EDF Motion* (including "Memorandum of Points and Authorities"), then EDF would have been limited to a claim of 30 hours for the time spent by Mr. Lennett in "preparation of materials to request attorneys' fees." *Id.* However, once EPA challenged the submission, making it an issue for disposition by the court, EDF was entitled to seek an award for fees for the additional time reasonably expended in defending the original request for fees. For us to rule otherwise would be to unfairly penalize EDF and to ignore the clear congressional mandate found in section 19(d) of TSCA.

---

**17.** Mr. Kennedy graduated from the University of Virginia Law School in 1969. He has extensive experience in civil litigation, including work in the Office of General Counsel of the EPA from March 1975 to January 1979; as Special Attorney in the Department of Justice from September 1975 to January 1979; and as Trial Attorney in the Pollution Control Section of the Department of Justice from January 1979 to February 1981. In February 1981 he became a partner in Trilling & Kennedy. *EDF Supplementary Motion* ("Declaration of Bingham Kennedy").

**18.** Mr. Trilling graduated from the law school at the University of California (Boalt Hall) in June 1971. He, too, has extensive experience in civil practice and litigation, including work as a staff attorney with the United States Post-

al Service from October 1971 to June 1973; as an Assistant United States Attorney in the Civil Division in California from February 1974 to June 1978; and as a Trial Attorney in the Pollution Control Section and the Hazardous Waste Section of the Land and Natural Resources Division of the Department of Justice from July 1978 to February 1981. In February 1981 he became a partner in Trilling & Kennedy. *EDF Supplementary Motion* ("Declaration of Barry Trilling").

**19.** In addition to their original "lodestar" claim, Trilling & Kennedy has asked the court to consider an additional 7.5 hours spent by Mr. Trilling in preparing the *EDF Reply on Supplementary Motion.*

---

## B. Documentation

The documentation submitted by Trilling & Kennedy of hours reasonably expended is both clear and thorough. The documentation also makes plain the fact that potentially duplicate and/or nonproductive hours have been excluded. Since we find that the documentation for the supplemental claim is as detailed and complete as the documentation for the case-in-chief, we have no difficulty in accepting it as submitted.

## C. Hours Reasonably Expended

EPA argues that EDF "overestimated the number of Trilling & Kennedy's hours that were 'reasonably expended'" on the work in question. *EPA Response to Supplementary Motion* at 5. In particular, EPA first contends that "EDF did not prevail on some aspects of the merits in this case, so any calculation of 'reasonable hours' for a fee award should be reduced according to the relative proportions of merits issues on which EDF won and lost." *Id.* For the reasons already given in section IV–B(1), *supra*, we reject this argument.

EPA next argues that the "hours should be further reduced, to the extent that the supplemental claim represents EDF efforts in litigating against intervenor EIA, rather than EPA, on fee award issues." *Id.* at 6. Insofar as this argument reasserts questions already disposed of in section IV–B(2), we reject it. However, insofar as the EPA position focuses on a claim that "compensation is being sought for about 10 hours of Trilling & Kennedy's time that was devoted solely to responding to EIA's argument that EDF's original fee award motion is untimely," *id.* at 7, we find it to be meritorious. On this latter point, we hold that the hours submitted by EDF for work performed by Trilling & Kennedy should be reduced by 9.75 hours to exclude the time spent on the timeliness issue. As we have already noted, the timeliness issue was patently meritless and thus warranted little if anything by way of response. More importantly, however, we note that counsel for EPA authorized counsel for EDF to represent that EPA did not object to the granting of the "Motion for Leave to File Out of Time." *See* note 2 *supra*. Therefore, unlike the other issues discussed in section IV–B(2), *supra*, the positions of EPA and the intervenor were not aligned on the issue of timeliness. For these reasons, we believe that the agency should not be charged for legal work done on behalf of EDF on this issue.

## D. Reasonable Hourly Rates

EPA asserts that the $110/hour rate claimed for the work done by Trilling & Kennedy is excessive. *EPA Response to Supplementary Motion* at 8. This argument is advanced despite the fact that EPA concedes that "Trilling & Kennedy are attorneys with levels of experience and competence equivalent to Mr. Butler and Ms. Warren of EDF." *Id.* at 10.

Since the arguments made by EPA to support this position are nearly identical to the ones raised in connection with the claim for attorneys' fees in the case-in-chief, we need not repeat our rulings on the agency's contentions. Suffice it to say that the EPA position finds no substantial support in the record and must, therefore, be rejected for the reasons already given in section IV–C *supra*. *See* also note 11 *supra*.

## E. Adjustments To The "Lodestar"

EDF has requested an upward adjustment to the "lodestar" of 50% for the hours expended by Trilling & Kennedy. Except for a 5% adjustment for a factor of "delay," we deny this request largely for the reasons given in section IV–E *supra*.

As to the "contingent nature of success" factor, EDF argues that the contingency fee arrangement between EDF and Trilling & Kennedy "is manifestly the situation envisioned as appropriate for upward adjustment" under *Copeland*. *EDF Reply on Supplementary Motion* at 6. We think not. The "contingency" in question is not whether Trilling & Kennedy will recover under their agreement with EDF, but whether EDF will recover fees under section 19(d) of

TSCA. As we have already said, "in this case, we believe that there was little or no risk that 'no fee' would be obtained." *See* section IV–E.

Furthermore, while the "quality of representation" furnished by Trilling & Kennedy was first-rate, the work done clearly was performed at levels of proficiency that were within the usual range of these experienced lawyers' skills. As a consequence, the hours expended by Trilling & Kennedy will be fully compensated by the amounts credited under the categories of "hours reasonably expended" and "reasonable hourly rates."

Lastly, we find no adjustment due for "benefits to the public." *See* Legislative History at 728. The work done by Trilling & Kennedy was helpful to the court in considering and deciding issues of first impression regarding the proper construction of section 19(d) of TSCA. Nevertheless, substantial guidance was available because of the existence of the legislative history and controlling precedents such as *Copeland.* We cannot, therefore, equate this work with the legal work done on the case-in-chief.

### VIII. THE AWARD OF ATTORNEYS' FEES FOR THE WORK DONE BY TRILLING & KENNEDY

In light of our holdings above, an award of attorneys' fees to EDF for the work done by Trilling & Kennedy shall be made in the following amount:

| Attorney | Hours | Rate/Hour | Total |
|---|---|---|---|
| B. Kennedy | 1.45 | $110 | $ 159.50 |
| B. Trilling | 81.1[20] | $110 | $8921.00 |
| | "Lodestar" fee | — | $9080.50 |
| | Upward Adjustment | — | 5% |
| | Total Award | — | $9534.50 |

### IX. CONCLUSION

For all of the reasons heretofore set forth in this opinion, we hereby rule that EDF shall be paid by EPA, as expeditiously as is

reasonably possible, an award of attorneys' fees totalling $99,534.50.

*So ordered.*

---

**20.** This figure includes the 7.5 hours spent by Mr. Trilling on the *EDF Reply on Supplementary Motion.*